**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SULAYMAN SARR, | No. 24-5264 |
| *Petitioner*, | Agency No. A096-837-307 |
| v. | |
| | OPINION |
| TODD BLANCHE, Acting Attorney General, | |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted January 9, 2026
San Francisco, California

Filed July 7, 2026

Before: Jacqueline H. Nguyen and Mark J. Bennett, Circuit Judges, and Kiyo A. Matsumoto, District Judge.[*]

Opinion by Judge Bennett

---

[*] The Honorable Kiyo A. Matsumoto, United States District Judge for the Eastern District of New York, sitting by designation.

# SUMMARY[**]

## Immigration

Denying Sulayman Sarr's petition for review from a decision of the Board of Immigration Appeals, the panel held that Sarr's drug trafficking conviction was a particularly serious crime rendering him ineligible for withholding of removal.

Under 8 U.S.C. § 1231(b)(3)(B)(ii), an alien is ineligible for withholding of removal if the Attorney General decides that the "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." By regulation, "an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community." 8 C.F.R. § 1208.16(d)(2)(i). In concluding that Sarr's conviction was a particularly serious crime, the BIA applied *Matter of Y-L-*, in which the Attorney General created a strong presumption that drug trafficking aggravated felonies are particularly serious. 23 I. & N. Dec. 270 (Att'y Gen. 2002).

Sarr argued that § 1231(b)(3)(B)(ii) required the agency to separately consider whether he "is a danger to the community of the United States." Recognizing that § 1231(b)(3)(B)'s statutory bar ultimately turns on the agency's determination of the alien's dangerousness, the panel concluded that the application of *Y-L-*'s strong presumption sufficed to trigger the further presumption—

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

codified by regulation at 8 C.F.R. § 1208.16(d)(2)—that Sarr was a danger to the community.

Next, Sarr contended that, applying *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), the court should overrule *Miguel Miguel v. Gonzales*, 500 F.3d 941 (9th Cir. 2007), in which this court afforded *Chevron* deference to *Y-L-*. The panel concluded that, even though the court had relied in *Miguel Miguel* on *Chevron*'s now-overruled interpretive methodology, that was not enough, under *Loper Bright*, to justify overruling a statutory precedent.

Finally, Sarr argued that *Y-L-*'s creation of a presumption without individualized consideration of dangerousness rendered § 1231(b)(3)(B) unconstitutionally vague. To avoid that question, Sarr urged the court to construe the statute not to permit the agency to create such a presumption. Noting that the court rejected the basis for this position in *Miguel Miguel*, and having determined that *Miguel Miguel* remains subject to statutory *stare decisis*, the panel concluded that Sarr's constitutional avoidance argument likewise failed.

In a concurrently filed memorandum disposition, the panel considered and rejected Sarr's other claims.

## COUNSEL

Lavi M. Ben Dor (argued), Maya Jeyendran, Thomas E. Moore, M.J. Kirsch Muñoz, Max E. Schulman, and Russell B. Balikian, Gibson Dunn & Crutcher LLP, Washington, D.C., for Petitioner.

Craig A. Newell Jr. (argued), Senior Litigation Counsel, Criminal Immigration Team; Rodolfo D. Saenz, Trial Attorney; Lindsay B. Glauner, Assistant Director; Office of Immigration Litigation; Yaakov M. Roth, Acting Assistant Attorney General; Civil Division, United States Department of Justice; for Respondent.

## OPINION

BENNETT, Circuit Judge:

Noncitizens ordered removed from the United States may still invoke certain forms of relief. For example, § 241(b)(3) of the Immigration and Nationality Act (INA) mandates withholding of removal, with certain exceptions, "where 'the alien's life or freedom would be threatened in [the country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'" *Bare v. Barr*, 975 F.3d 952, 961 (9th Cir. 2020) (alteration in original) (quoting § 241(b)(3)(A), codified at 8 U.S.C. § 1231(b)(3)(A)). "One exception is when the alien has been convicted of a 'particularly serious crime.'" *Id.* (quoting 8 U.S.C. § 1231(b)(3)(B)(ii)). Such a conviction renders the alien ineligible for statutory withholding of removal. *Id.* at 966.

In *Matter of Y-L-*, a published opinion, the Attorney General specified "that all drug-trafficking offenses are particularly serious except in 'very rare' instances." *Guerrero v. Whitaker*, 908 F.3d 541, 543 (9th Cir. 2018) (quoting *Y-L-*, 23 I. & N. Dec. 270, 276 (Att'y Gen. 2002), *disapproved of on other grounds by Zheng v. Ashcroft*, 332 F.3d 1186, 1196 (9th Cir. 2003)).   In *Miguel-Miguel v. Gonzales*, we rejected a facial challenge to *Y-L-*.  *See* 500 F.3d 941, 945, 949 (9th Cir. 2007).  In so doing, we afforded *Chevron*[1] deference to the Attorney General's interpretation of § 1231(b)(3)(B) as permitting him to create, for a category of crimes, a strong rebuttable presumption of particular dangerousness.  *Id.* at 947–49.

At the time, *Chevron* "sometimes required courts to defer to 'permissible' agency interpretations of the statutes those agencies administer"—even when the reviewing court might otherwise have read the statute differently.  *Loper Bright*, 603 U.S. at 378.  But in *Loper Bright*, the Supreme Court overruled *Chevron* and held that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Id.* at 412.  Now, just as before *Chevron*, while Executive Branch interpretations have the "power to persuade," they lack the "power to control."  *Id.* at 402 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Relying on *Loper Bright*, Petitioner Sulayman Sarr brings a new challenge to *Y-L-*.  But *Miguel-Miguel*, our precedent deferring to *Y-L-*'s interpretation of § 1231(b)(3)(B) remains in his way.  *See* 500 F.3d at 949.

---

[1] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

Though we relied there on *Chevron*'s now-overruled "interpretive methodology," *Miguel-Miguel* is "still subject to statutory *stare decisis*." *See Loper Bright*, 603 U.S. at 412. Because Sarr argues merely that *Miguel-Miguel* was wrongly decided under *Chevron*, he cannot overcome the "enhanced force" of statutory *stare decisis*. *See Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015). Sarr thus fails to show that *Miguel-Miguel* is "clearly irreconcilable with" *Loper Bright*. *See Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)) (upholding as consistent with *Loper Bright* our precedent deferring under *Chevron* to the agency's interpretation of 8 U.S.C. § 1227(a)(2)(A)(ii)).

Under *Miguel-Miguel*, we determine that the agency properly applied *Y-L-* and so deny the petition for review.[2]

# I

Sarr is a thirty-nine-year-old native and citizen of the Republic of The Gambia. In 2007, Sarr entered the United States on a B1 visa for temporary business travel. He then overstayed his visa. But after marrying a United States citizen in 2009, Sarr gained lawful permanent resident status.

In July 2021, Sarr was convicted in the District of Utah on one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. That felony drug-trafficking conviction resulted in Sarr's order of removal and this petition for review.

---

[2] In a concurrently filed memorandum disposition, we consider and reject Sarr's other claims.

## A

Sarr's criminal conduct arose out of a car sale. In July 2018, an acquaintance purchased Sarr's car but failed to pay $4,000 of the agreed $11,000 price. Over a four-month period, to "get [his] money back," Sarr received methamphetamine from the car purchaser.[3] Sarr then transferred the methamphetamine to a friend. Each time, Sarr transported up to 225 grams, or about eight ounces.[4] From there, the friend sold the methamphetamine and shared the proceeds with Sarr.

Sarr was charged in a twenty-four-count indictment. He pleaded guilty to one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. The other counts were then dismissed on the government's motion.

Sarr was sentenced to twenty-four months' imprisonment and thirty-six months' supervised release. He served sixteen months in prison (with good time credits under the First Step Act) and was released in February 2023.

## B

Upon his release, Sarr was detained by agents of the Department of Homeland Security (DHS). DHS then commenced removal proceedings. For having been convicted of "a drug trafficking crime" and thus of an "aggravated felony" as defined in 8 U.S.C.

---

[3] The immigration judge (IJ) asked Sarr: "How many times did you take delivery from him?" Sarr responded: "I don't know, honestly. Quite a few. Because it lasted for about four months."

[4] The IJ asked Sarr: "What kind of quantity are we talking about?" Sarr responded: "It's ounces here and there. You get ounce here and there. Then I think the most was about 225 grams or so."

§ 1101(a)(43)(B), DHS charged Sarr with being subject to removal pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) and (B)(i).[5] In his removal proceeding, Sarr admitted his alienage, his lawful permanent resident status, and his federal conviction for conspiracy to distribute methamphetamine. Based on Sarr's statements and his judgment of conviction, the IJ found Sarr removable as charged and ordered him removed from the United States to The Gambia.

Sarr applied for asylum, withholding of removal under the INA, and protection under the Convention Against Torture (CAT).[6] Sarr based his claims on his alleged fear of being harmed by radical Islamists upon his return to The Gambia, a supermajority Sunni Muslim country. Both Sarr and DHS submitted written statements and documentary evidence.

The IJ held a merits hearing at which Sarr testified in support of his claims. Sarr said that though he was raised

---

[5] Section 1227(a)(2)(A)(iii) renders deportable "[a]ny alien who is convicted of an aggravated felony." 8 U.S.C. § 1227(a)(2)(A)(iii). Section 1227(a)(2)(B)(i) renders deportable "[a]ny alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law . . . relating to a controlled substance," with a *de minimis* exception for possession of marijuana for personal use. *Id.* § 1227(a)(2)(B)(i).

[6] Under CAT, "[i]f the [IJ] determines that the alien is more likely than not to be tortured in the country of removal, the alien is entitled to protection" "either in the form of withholding of removal or in the form of deferral of removal." 8 C.F.R. § 1208.16(c)(4). The regulations mandate denial of withholding of removal "if the applicant falls within" the exceptions set forth in 8 U.S.C. § 1231(b)(3)(B). 8 C.F.R. § 1208.16(d)(2)(i). Even when that bar applies, however, CAT still grants to an otherwise eligible alien "deferral of removal to the country where he or she is more likely than not to be tortured." *Id.* § 1208.17(a).

Muslim, he currently identifies as "spiritual." Sarr also stated that, since eighth grade, he had created Afrobeats music under the stage name K-6. In 2020, Sarr appeared on Gambian radio to promote his music. While on air, Sarr identified as a Spiritualist. Sarr then told the interviewer that he believes in Heaven, but not in the way the Quran describes, because he "cannot believe in a city of jewels where a river of milk and honey flows beneath and a reward of 'Orruayne' (wives) whose beauties surpass everything beautiful one can imagine." Sarr further testified that, following the radio interview, eight men led by an imam came to his family's home in The Gambia. Sarr said that the imam slapped his mother and then issued a fatwa (or religious order) directing followers to torture or kill Sarr if he ever returned to The Gambia or if followers ever encountered Sarr.[7] Sarr, however, admitted that he never suffered physical harm in The Gambia.

After considering the documentary evidence and Sarr's testimony, the IJ denied his applications for relief and protection. The IJ found "that because of the volume of narcotics involved in this case" and Sarr's "personal involvement in what is essentially wholesale distribution," Sarr had been convicted of a "particularly serious crime"— conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. That conviction, the IJ determined, made Sarr "ineligible for asylum and

---

[7] It is unclear whether Sarr claims that the imam ordered his followers specifically or followers of Islam generally to kill Sarr.

withholding of removal."[8]  The IJ accordingly denied Sarr's applications for asylum and withholding of removal.[9]

Sarr appealed to the Board of Immigration Appeals (BIA).[10]  Reviewing the IJ's factual findings, the BIA agreed

---

[8] The IJ noted as follows:

> [Sarr] conceded as part of his written submissions to the court and in court today that he has been convicted of a particularly serious crime.  [Sarr] was convicted in federal district court for conspiracy to distribute methamphetamine.  In questioning, [Sarr] indicated that because of a debt that was owed to him, in order to recoup the money, he essentially agreed to take delivery of methamphetamine on multiple occasions over a period of four months.  [Sarr] indicated that this was in the amount of several ounces and then later indicated that the largest shipment that he received was over 200 grams.   [Sarr] then provided this methamphetamine to another individual for him to sell in order to help [Sarr] recoup the money that he believed he was owed based on the transaction over a vehicle.  The court finds that because of the volume of narcotics involved in this case, [Sarr's] personal involvement in what is essentially wholesale distribution, [Sarr] has been convicted of a particularly serious crime that makes him ineligible for asylum and withholding of removal.

In this appeal, the government does not argue that Sarr forfeited or waived his claims for withholding of removal.

[9] Finding that Sarr had failed to prove a likelihood that he "would be tortured or killed if returned to [The] Gambia," the IJ also denied Sarr's application for deferral of removal under CAT.

[10] The BIA initially dismissed Sarr's appeal because he had failed to file a brief.  Sarr then moved to reopen his case before the BIA.  After finding that Sarr had not received the initial briefing schedule, the BIA vacated its initial decision and granted Sarr's motion to reopen.

that, over the course of four months, Sarr "took delivery of methamphetamine on multiple occasions before providing it to another individual to sell."  The BIA also affirmed the IJ's finding that Sarr's conduct constituted "not merely peripheral" involvement in "essentially wholesale distribution" involving more than a small amount of methamphetamine.

From there, applying *Matter of Y-L-*, 23 I. & N. Dec. at 274, and *Miguel-Miguel*, 500 F.3d at 949, the BIA presumed that Sarr's "conviction for conspiracy to distribute methamphetamine is a particularly serious crime."  The BIA noted that, under *Y-L-*, the presumption "can be rebutted only if the applicant demonstrates that six 'minimum' or threshold requirements are satisfied," and even then, only "under the most extenuating circumstances that are both extraordinary and compelling."  The BIA agreed with the IJ that because Sarr participated in organized drug distribution involving more than a small amount of methamphetamine, Sarr failed to meet several of *Y-L-*'s six minimum factors.

The BIA thus determined that Sarr's conviction of an aggravated felony involving drug trafficking was for a particularly serious crime.  From there, pursuant to 8 U.S.C. § 1158(b)(2)(A)(ii), 8 U.S.C. § 1231(b)(3)(B)(ii), and 8 C.F.R. § 1208.16(d)(2), the BIA concluded that Sarr's conviction of a particularly serious crime "barred [him] from

applying for asylum and withholding of removal."[11]  The
BIA accordingly dismissed Sarr's appeal.[12]

Sarr petitioned for review, challenging the BIA's denial
of withholding of removal.[13]  Sarr now argues that the BIA
erred in finding him ineligible for withholding of removal.

## II

Pursuant to 8 U.S.C. § 1252, we have limited appellate
jurisdiction.   Under § 1252(a)(2)(C), we generally lack
jurisdiction to review Sarr's final order of removal because
the agency ordered him removed from the United States

---

[11] The BIA reasoned as follows:

> We have considered [Sarr]'s arguments on appeal
> but are not persuaded his drug trafficking offense does
> not qualify as a particular serious crime.  Contrary to
> [Sarr]'s appellate argument, the record supports the
> [IJ]'s findings.  The record reflects that [Sarr] testified
> that during a period of about four months he received
> shipments of drugs and took those drugs to a friend of
> his who would then sell the drugs after they exchanged
> money.  [Sarr] also testified that the largest shipment
> he received was for 225 grams of methamphetamine.
> For the reasons provided by the [IJ], we agree that
> [Sarr] has not rebutted the 'extraordinarily strong
> presumption' that his conviction for conspiracy to
> distribute methamphetamine is a particularly serious
> crime.

[12] The BIA also determined that Sarr had failed to demonstrate a
likelihood of his torture upon his return to The Gambia.  The BIA thus
affirmed the IJ's denial of Sarr's claim for deferral of removal under
CAT.

[13] Sarr also challenges the BIA's affirmance of the IJ's denial of his
request for deferral of removal under CAT.  As noted, we consider and
reject Sarr's claim for deferral of removal under CAT in a concurrently
filed memorandum disposition.

under 8 U.S.C. § 1227(a)(2)(A)(iii) and (B)(i). *See Park v. Garland*, 72 F.4th 965, 973 (9th Cir. 2023) (discussing § 1227(a)(2)(A)(iii)); *Romero-Millan v. Garland*, 46 F.4th 1032, 1039–40 (9th Cir. 2022) (discussing § 1227(a)(2)(B)(i)). But under § 1252(a)(2)(D), we retain jurisdiction to review "constitutional claims or questions of law." *Park*, 72 F.4th at 973; *Romero-Millan*, 46 F.4th at 1040. Thus, we may "review[] whether the BIA applied the correct legal standard in its particularly-serious-crime analysis." *Park*, 72 F.4th at 974. In that inquiry, "we consider 'whether the agency relied on the appropriate factors and proper evidence to reach [its] conclusion.'" *Id.* (alteration in original) (quoting *Flores-Vega v. Barr*, 932 F.3d 878, 884 (9th Cir. 2019)).

"Where, as here, the BIA agrees with the IJ's reasoning, we review both decisions." *Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1293 (9th Cir. 2018). "We review legal questions, including questions of statutory interpretation, *de novo*." *Lopez*, 116 F.4th at 1036.

## III

### A

The INA mandates withholding of removal, with certain exceptions, "where 'the alien's life or freedom would be threatened in [the country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'" *Bare*, 975 F.3d at 961 (alteration in original) (quoting 8 U.S.C. § 1231(b)(3)(A)).

The exceptions appear in subparagraph (B), which in relevant part provides as follows:

> Subparagraph (A) does not apply to an alien . . . if the Attorney General decides that—
>
> \* \* \*
>
> (ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States . . . .
>
> \* \* \*
>
> For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1231(b)(3)(B).

In short, subparagraph (B)(ii) bars subparagraph (a)'s withholding of removal "when the alien has been convicted of a 'particularly serious crime.'" *Bare*, 975 F.3d at 961 (quoting 8 U.S.C. § 1231(b)(3)(B)(ii)). The pertinent regulation creates an identical exception to withholding of removal under CAT. *See* 8 C.F.R. § 1208.16(d)(2)(i) (mandating denial of withholding of removal under CAT "if

the applicant falls within [8 U.S.C. § 1231(b)(3)(B)]"). Thus, a determination that the alien has been convicted of a particularly serious crime renders the alien "categorically ineligible for" withholding of removal. *Park*, 72 F.4th at 974.

## B

Under 8 U.S.C. § 1231(b)(3)(B), crimes can qualify as particularly serious in two ways. *Park*, 72 F.4th at 974. "First, an aggravated felony with an aggregate sentence of at least five years' imprisonment is categorically a particularly serious crime." *Id.* (citing 8 U.S.C. § 1231(b)(3)(B)(iv)). Second, for "convictions falling outside the category established by Congress," the agency must "conduct a case-by-case analysis." *Blandino-Medina v. Holder*, 712 F.3d 1338, 1345 (9th Cir. 2013). In practice, by regulation, most case-by-case adjudications are handled first by an IJ, and then by the BIA on appeal. *See* 8 C.F.R. §§ 1003.1, 1003.10. But the Attorney General can direct the BIA to refer any case for the Attorney General's review. *See id.* § 1003.1(h).

In *Matter of Frentescu*, "the BIA developed a multi-factor test to determine on a case-by-case basis whether a crime is particularly serious." *Bare*, 975 F.3d at 961 (citing *Frentescu*, 18 I. & N. Dec. 244, 247 (B.I.A. 1982)). Subsequent cases "altered and refined the analysis." *Id.* (citing *Matter of N-A-M-*, 24 I. & N. Dec. 336, 342 (B.I.A. 2007), *overruled in part on other grounds by Blandino-Medina*, 712 F.3d at 1347–48). Under the refined *Frentescu* framework, the BIA considers these factors: "(1) the nature of the conviction, (2) the type of sentence imposed, and (3) whether the circumstances and underlying facts of the conviction 'justify the presumption that the

convicted immigrant is a danger to the community.'"
*Chmukh v. Garland*, 124 F.4th 670, 678 (9th Cir. 2024)
(quoting *Delgado v. Holder*, 648 F.3d 1095, 1107 (9th Cir.
2011) (en banc)). "This analysis begins with the BIA
determining whether the elements of the crime of conviction
'potentially bring the crime into a category of particularly
serious crimes.'" *Mendoza-Garcia v. Garland*, 36 F.4th
989, 999 (9th Cir. 2022) (quoting *N-A-M-*, 24 I. & N. Dec.
at 342). "If so, the BIA then considers 'all reliable
information' in analyzing the remaining two factors.'" *Id.*
(quoting *N-A-M-*, 24 I. & N. Dec. at 342).

Under the refined *Frentescu* framework, the most
important consideration is "whether the type and
circumstances of the crime indicate that the alien will be a
danger to the community." 18 I. & N. Dec. at 247; *see also
Alphonsus v. Holder*, 705 F.3d 1031, 1039 (9th Cir. 2013)
(noting the BIA's continued "reliance on dangerousness as
the sine qua non of a particularly serious crime"), *abrogated
on other grounds by Guerrero*, 908 F.3d at 544. This follows
the statute's directive to consider whether "the alien, having
been convicted by a final judgment of a particularly serious
crime is a danger to the community of the United States." 8
U.S.C. § 1231(b)(3)(B)(ii). But in *Matter of Carballe*, the
BIA interpreted the statute's language as not requiring "a
separate determination of dangerousness" focused on the
likelihood of recidivism. 19 I. & N. Dec. 357, 360 (B.I.A.
1986). On that understanding, the BIA concluded that "[i]f
it is determined that the crime was a 'particularly serious'
one, the question of whether the alien is a danger to the
community of the United States is answered in the
affirmative." *Id.* Shortly thereafter, we deferred under
*Chevron* to the agency's "reasonable" interpretation that the
statute "requir[es] only the factual finding of conviction of a

particularly serious crime to support the determination of danger to the community." *Ramirez-Ramos v. INS*, 814 F.2d 1394, 1397 (9th Cir. 1987).

So, under *Frentescu*, as modified by *Carballe*, the determination that an alien has been convicted of a particularly serious crime "justif[ies] the presumption that the convicted immigrant is a danger to the community." *Delgado*, 648 F.3d at 1107; *accord Alphonsus*, 705 F.3d at 1039–41. *Carballe*'s presumption has since been codified by regulation. *See* 8 C.F.R. § 1208.16(d)(2)(i) ("For purposes of [8 U.S.C. § 1231(b)(3)(B)(ii)], . . . an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community."). Thus, "once an individual is found to have been convicted for committing a particularly serious crime, he or she '*shall* be considered to constitute a danger to the community.'" *Gomez-Sanchez v. Sessions*, 892 F.3d 985, 991 (9th Cir. 2018) (quoting 8 C.F.R. § 1208.16(d)(2)).

Though the refined *Frentescu* framework applies to most crimes in case-by-case adjudication under 8 U.S.C. § 1231(b)(3)(B), aggravated felonies involving drug trafficking entail a different analysis. *See Miguel-Miguel*, 500 F.3d at 949. In *Y-L-*, the Attorney General specified "that all drug-trafficking [aggravated felonies] are particularly serious except in 'very rare' instances." *Guerrero*, 908 F.3d at 543 (quoting *Y-L-*, 23 I. & N. Dec. at 276). Outside those instances, under *Y-L-*, all "aggravated felonies involving unlawful trafficking in controlled substances presumptively constitute 'particularly serious crimes' within the meaning of [§ 1231(b)(3)(B)(ii)]." 23 I. & N. Dec. at 274.

The Attorney General, however, declined to pronounce a per se rule in *Y-L-*. *Id.* at 276. Instead, he left open "the possibility of the very rare case where an alien may be able to demonstrate extraordinary and compelling circumstances that justify treating a particular drug trafficking crime as falling short" of being a particularly serious crime. *Id.* Such a case, he determined, "would need to include, at a *minimum*:"

> (1) a very small quantity of controlled substance; (2) a very modest amount of money paid for the drugs in the offending transaction; (3) merely peripheral involvement by the alien in the criminal activity, transaction, or conspiracy; (4) the absence of any violence or threat of violence, implicit or otherwise, associated with the offense; (5) the absence of any organized crime or terrorist organization involvement, direct or indirect, in relation to the offending activity; and (6) the absence of any adverse or harmful effect of the activity or transaction on juveniles.

*Id.* at 276–77. "[I]f an alien fails to satisfy even one of the *Matter of Y-L-* criteria, he cannot overcome the presumption." *Park*, 72 F.4th at 975. But in the rare case where "*all* of these criteria were demonstrated by an alien," *Y-L-* instructed the agency to "consider whether other, more unusual circumstances . . . might justify departure from the default interpretation that drug trafficking felonies are 'particularly serious crimes.'" 23 I. & N. Dec. at 277.

In sum, "[t]hree categories of crimes may be determined to be particularly serious." *Guerrero*, 908 F.3d at 543. "First, by statute, any aggravated felony that carried an aggregate term of at least five years' imprisonment is particularly serious." *Id.* (citing 8 U.S.C. § 1231(b)(3)(B)). "Second, in general, all other crimes may, on a case-by-case basis, be determined to be particularly serious" under the refined *Frentescu* framework "as applied to the facts of the alien's conviction." *Id.* And third, in case-by-case adjudication under *Y-L-*, "all drug-trafficking offenses are particularly serious except in 'very rare' instances." *Id.* (quoting *Y-L-*, 23 I. & N. Dec. at 276).

## C

In *Miguel-Miguel*, the petitioner challenged *Y-L-* on two grounds. 500 F.3d at 945. He argued that "*Y-L-* created what amounts to a per se rule that turns all drug trafficking offenses into particularly serious crimes under § 1231(b)." *Id.* He also "contend[ed] that the Attorney General was forbidden from promulgating such a per se rule by," among other things, our precedent and "the statute's plain text." *Id.*

We rejected the first argument "because *Y-L-* on its face purports to create only a strong presumption, not a per se rule." *Id.*[14] We rejected the second argument because "[n]either our precedent nor the text of § 1231(b)(3) precluded the Attorney General from issuing *Matter of Y-L-*" and "creating the strong presumption." *Id.* at 945, 947. We

---

[14] We also predicted that "there will be some cases in which [*Y-L-*'s] exception applies." *Miguel-Miguel*, 500 F.3d at 947. That prediction has proven correct. *See, e.g.*, *Lopez v. Att'y Gen.*, No. 23-1557, 2024 WL 637465, at *1 n.1 (3d Cir. Feb. 15, 2024) (unpublished disposition) ("The IJ found Lopez's conviction to fall under the exceptions set forth in [*Y-L-*].").

reasoned that the BIA was bound by its own decisions applying *Frentescu*, but that the Attorney General had the authority to "overrule the BIA by issuing a published opinion"—as he did in *Y-L-*. *Id.* at 947 (first citing 8 C.F.R. § 103.37(g); then citing 8 C.F.R. § 1003.1(g); and then citing BIA Practice Manual § 1.4(g) (2004)). And though we found § 1231(b)(3)(B) "ambiguous as to whether Congress meant to limit the Attorney General's ability to create strong presumptions" applicable in case-by-case adjudication, we held that his construction of that statute—"as providing him with discretion to create a strong presumption that drug trafficking offenses are particularly serious crimes"—was "not impermissible." *Id.* at 948–49. We thus deferred to it under *Chevron*. *See id.* at 949. We accordingly determined that "after *Matter of Y-L-*, a *Frentescu* analysis is no longer required with regard to drug trafficking offenses." *Id.*

## IV

Sarr accepts that his conviction constitutes an aggravated felony involving drug trafficking. *See* 8 U.S.C. § 1101(a)(43)(B). For purposes of the statutory bar to asylum relief, *id.* § 1158(b)(2)(A)(ii), "an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime," *id.* § 1158(b)(2)(B)(i). Sarr therefore concedes, as he must, that he is "categorically ineligible for asylum relief." *Flores-Vega*, 932 F.3d at 884.[15]

"The analysis is different for withholding of removal." *Id.* Because Sarr "was sentenced to fewer than five years,

---

[15] Sarr, however, preserves the argument that the agency erred in deeming him ineligible for asylum without addressing whether he "constitute[d] a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii).

the [agency] *may* determine that [his] aggravated felony conviction qualifies as a particularly serious crime." *Id.* But recall that *Y-L-* applies a strong presumption that Sarr committed a particularly serious crime. *See* 23 I. & N. Dec. at 274. And to rebut that presumption, Sarr was required to meet *Y-L-*'s six minimum factors and also show that extraordinary and compelling circumstances otherwise indicate that he did not commit a particularly serious crime. *See id.* at 276–77.

Sarr does not argue that the BIA erred in applying the *Y-L-* factors. Instead, he argues that 8 U.S.C. § 1231(b)(3)(B)(ii) required the agency to separately consider whether Sarr "is a danger to the community of the United States," regardless of the *Y-L-* factors. In the alternative, he asks us to overrule *Miguel-Miguel* and disapprove of *Y-L-*. We address his arguments in turn.

## A

Sarr argues that the BIA abused its discretion by not considering whether he "is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii). According to Sarr, the statutory bar to withholding of removal is triggered only when the agency finds that the alien was: (1) "convicted by a final judgment of a particularly serious crime;" and, separately, (2) "is a danger to the community of the United States." *Id.* In Sarr's view, *Y-L-*'s presumption satisfies only the first condition (conviction of a particularly serious crime), and not the second condition (dangerousness).

With this argument, Sarr urges a novel interpretation of *Y-L-* as creating a strong presumption of particular seriousness but still requiring, just as under *Frentescu*, an individualized determination of the alien's dangerousness. As Sarr sees it, in *Y-L-* itself, the Attorney General

considered whether the individual "pose[d] a danger to the community of the United States" based on the "dangers associated with [his] direct role in the drug trafficking offense." 23 I. & N. Dec. at 270, 278. Thus, according to Sarr, "*Miguel-Miguel* contemplates that dangerousness will be considered as part of the inquiry into whether *Y-L-*'s presumption is rebutted in particular cases."

Sarr correctly observes that, in case-by-case adjudication under 8 U.S.C. § 1231(b)(3)(B), an alien's "dangerousness" is "the 'essential key' to determining whether the individual's conviction was for a particularly serious crime." *Gomez-Sanchez*, 892 F.3d at 991 (quoting *Alphonsus*, 705 F.3d at 1041). Consistent with the statute, under the refined *Frentescu* framework, the alien's dangerousness is the "most important[]" factor in determining the crime's particular seriousness. *Delgado*, 648 F.3d at 1107. But *Y-L-* overruled "*Frentescu* in part by precluding application of the *Frentescu* factors in most drug trafficking cases." *Miguel-Miguel*, 500 F.3d at 947. So when the alien has been convicted of an aggravated felony involving drug trafficking, at least when the *Y-L-* presumption is not rebutted, the agency need not consider the *Frentescu* factors, including the most important factor: "whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *See Frentescu*, 18 I. & N. Dec. at 247; *Miguel-Miguel*, 500 F.3d at 947.

Further, *Y-L-* did not purport to overrule *Carballe*, which interpreted the statute's language as not requiring "a separate determination of dangerousness focusing on the likelihood of future serious misconduct on the part of the alien." 19 I. & N. Dec. at 360. *Carballe* instead determined that "those aliens who have been finally convicted of particularly serious crimes are presumptively dangers to this country's

community." *Id.* Applied together, the *Y-L-* presumption "justif[ies]" the further *Carballe* presumption, codified in 8 C.F.R. § 1208.16(d)(2)(i), "that the convicted immigrant is a danger to the community." *Delgado*, 648 F.3d at 1107.[16]

Indeed, in *Y-L-*, the Attorney General expressly discussed "[t]he devastating effects of drug trafficking offenses on the health and general welfare, not to mention national security, of this country." 23 I. & N. Dec. at 276. His evaluation of the "offenses' dangerous nature and severity" gave rise to *Y-L-*'s strong presumption. *Gilbertson v. Garland*, 7 F.4th 700, 704–05 (8th Cir. 2021). The Attorney General then proceeded to consider whether the individual aliens in *Y-L-* "present[ed] the kind of extraordinary and compelling circumstances that might warrant treating [their] aggravated drug trafficking felonies as anything other than 'particularly serious crimes.'" 23 I. & N. Dec. at 277. None of them satisfied the six minimum factors, so the presumption applied to each of them without any need "to consider whether other, more unusual circumstances . . . might justify departure from the default

---

[16] For this reason, insofar as Sarr argues that 8 U.S.C. § 1231(b)(3)(B)(ii) required the agency to separately determine his dangerousness, his argument attacks *Ramirez-Ramos*. There, we deferred under *Chevron* to the agency's interpretation of 8 U.S.C. § 1253(h)(2)(B), § 1231(b)(3)(B)(ii)'s identical predecessor, as not requiring a separate determination of dangerousness. *See Ramirez-Ramos*, 814 F.2d at 1397. And *Carballe*, not *Y-L-*, created the presumption that an alien convicted of a particularly serious crime constitutes a danger to the community. *See Carballe*, 19 I. & N. Dec. at 360. But Sarr expressly preserves and does not make the argument that *Ramirez-Ramos* should be overturned. Thus, in this appeal, we apply *Carballe*'s presumption, as codified in regulation. *See* 8 C.F.R. § 1208.16(d)(2)(i).

interpretation." *See id.* at 277–78.**[17]**  And because the aliens had been convicted of particularly serious crimes, under *Carballe*, individualized assessments of their dangerousness were unnecessary.  *See* 19 I. & N. Dec. at 360.

Here, because Sarr was convicted of an aggravated felony involving drug trafficking, *see* 8 U.S.C. § 1101(a)(43)(B), the agency presumed him to have committed a particularly serious crime, *see Y-L-*, 231 I. & N. Dec. at 274, 276–77, and therefore considered him to constitute a danger to the community, *see Carballe*, 19 I. & N. Dec. at 360.  Doing so was proper because, again, "after *Matter of Y-L-*, a *Frentescu* analysis is no longer

---

[17] We recently confirmed this understanding of *Y-L-* in *Park*, 72 F.4th at 977.  There, we described *Y-L-* as having engaged in a categorical analysis of the danger to the community posed by drug trafficking aggravated felonies.  *See id.*

Sarr argues that this understanding of *Y-L-* conflicts with that of our sister circuits.  Sarr's claim, however, invokes only *Frentescu* framework cases, one of which does not even mention *Y-L-*, *see Annor v. Garland*, 95 F.4th 820, 830 (4th Cir. 2024), and one of which predates it, *see Yousefi v. INS*, 260 F.3d 318, 329–30 (4th Cir. 2001) (per curiam).  In the third case, though the IJ had applied *Y-L-*, the BIA reversed and applied *Frentescu*.  *See Dor v. Garland*, 46 F.4th 38, 42–43 (1st Cir. 2022).  On review, the First Circuit vacated and remanded because "[t]he BIA's decision did not apply *Frentescu* to the facts, and even to the extent it could be argued the BIA did conduct such an application by listing off facts, the conclusion that followed was bereft of any meaningful or rational explanation."  *Id.* at 47.  That precedent is inapposite here because the BIA applied *Y-L-*, not *Frentescu*.

Sarr also misplaces reliance on *DeCarvalho v. Garland*, 18 F.4th 66, 72 (1st Cir. 2021).  There, the First Circuit vacated and remanded the agency's finding that the petitioner was not eligible for withholding of removal because the IJ had told the petitioner, who was proceeding pro se, that *Y-L-* imposed a per se bar, not a strong presumption.  *Id.* at 69, 71.  The agency did not commit a similar error here.

required with regard to drug trafficking offenses." *Miguel-Miguel*, 500 F.3d at 949. [18] And though § 1231(b)(3)(B)'s statutory bar to withholding of removal ultimately turns on the agency's determination of the alien's dangerousness, *see Alphonsus*, 705 F.3d at 1039, "once an individual is found to have been convicted for committing a particularly serious crime, he or she '*shall* be considered to constitute a danger to the community,'" *Gomez-Sanchez*, 892 F.3d at 991 (quoting 8 C.F.R. § 1208.16(d)(2)). In short, under current law, the application of *Y-L-*'s strong presumption sufficed to trigger the further presumption that Sarr is a danger to the community. *See Miguel-Miguel*, 500 F.3d at 949; *Gomez-Sanchez*, 892 F.3d at 991.

In case-by-case adjudication under 8 U.S.C. § 1231(b)(3)(B), *Frentescu* and *Y-L-* present different tracks for determining crimes to be particularly serious. *See Guerrero*, 908 F.3d at 543. Under either framework, once the crime of conviction is determined to be particularly serious, the alien "shall be considered to constitute a danger

---

[18] Because the BIA was not required to conduct a *Frentescu* analysis in this case, *see Miguel-Miguel*, 500 F.3d at 947, the *Frentescu* framework cases cited by Sarr do not help him. *See, e.g.*, *Gomez-Sanchez*, 892 F.3d at 988; *Alphonsus*, 705 F.3d at 1034; *Afridi v. Gonzales*, 442 F.3d 1212, 1214 (9th Cir. 2006), *overruled on other grounds by Estrada-Espinoza v. Mukasey*, 546 F.3d 1147 (9th Cir. 2008) (en banc).

Sarr also argues that the BIA committed reversible error by failing to discuss the key issue of dangerousness and precedents supporting his claim. *See Kaur v. Wilkinson*, 986 F.3d 1216, 1229 (9th Cir. 2021), *abrogated on other grounds by Urias-Orellana v. Bondi*, 607 U.S. 537 (2026). This argument fails because "it was not a misapplication of the governing standard." *Chmukh*, 124 F.4th at 680. Under *Y-L-*, "[t]he agency's description and explanation of [Sarr's] offenses show why he committed a particularly serious crime and was therefore a danger to the community." *See id.*

to the community."  8 C.F.R. § 1208.16(d)(2)(i); *see also Ramirez-Ramos*, 814 F.2d at 1397 (deferring under *Chevron* to the agency's interpretation of 8 U.S.C. § 1231(b)(3)(B)(ii)'s identical predecessor).  In this case, the agency properly applied *Y-L-* and did not abuse its discretion in determining that Sarr had been convicted of a particularly serious crime.  *See Miguel-Miguel*, 500 F.3d at 947.  From there, the agency properly applied 8 C.F.R. § 1208.16(d)(2)(i).  *See Ramirez-Ramos*, 814 F.2d at 1397. Thus, under current law, Sarr is ineligible for withholding of removal.

## B

Sarr contends in the alternative that, applying *Loper Bright*, we should overrule *Miguel-Miguel* and disapprove of *Y-L-*.  The government counters that *Miguel-Miguel* continues to bind us.  We agree with the government.

Following *Loper Bright*'s overruling of *Chevron*, in deciding questions of statutory interpretation, "we may look to agency interpretations for guidance, but do not defer to the agency." *Lopez*, 116 F.4th at 1036.  Despite this "change in interpretive methodology," however, "prior cases that relied on the *Chevron* framework" remain good law and are "still subject to statutory *stare decisis*." *Loper Bright*, 603 U.S. at 412.[19]

---

[19] Sarr contends that the Court's statement in *Loper Bright* addressed only prior decisions of the Supreme Court, and not prior decisions of the lower courts.  But we have not understood it that way.  *See Murillo-Chavez v. Bondi*, 128 F.4th 1076, 1087 (9th Cir. 2025).  Instead, we have held without such limitation that *Loper Bright* "does not 'call into question prior cases that relied on the *Chevron* framework.'" *Lopez*, 116 F.4th at 1045 (quoting *Loper Bright*, 603 U.S. at 412).

Sarr argues that *Miguel-Miguel* has been effectively overruled because its "reasoning or theory" is "clearly irreconcilable with" *Loper Bright*. *See Miller*, 335 F.3d at 893. We applied *Chevron* deference in *Miguel-Miguel*. 500 F.3d at 949. And so, in that respect, we employed legal reasoning that is clearly irreconcilable with *Loper Bright*. That, however, "is not enough to justify overruling a statutory precedent." *Loper Bright*, 603 U.S. at 412. "[O]ur holdings 'that *specific* agency actions are lawful' were not overruled by *Loper Bright* simply because they relied on *Chevron*." *Murillo-Chavez*, 128 F.4th at 1087 (quoting *Loper Bright*, 603 U.S. at 412). Sarr's conclusion therefore does not follow.

Despite this, Sarr presses forward. He argues that we should overrule *Miguel-Miguel* because *Y-L-* misinterpreted 8 U.S.C. § 1231(b)(3)(B). He also contends that *Miguel-Miguel* mistakenly relied on the Attorney General's representation to the panel that *Y-L-* is "not a per se rule," 500 F.3d at 945. But these are merely arguments that *Miguel-Miguel* was wrongly decided at the time. Because such arguments do not overcome statutory *stare decisis*, we as a three-judge panel "lack the authority to overrule" *Miguel-Miguel*. *Lopez*, 116 F.4th at 1045. Thus, *Miguel-Miguel* "remains precedential authority which binds us." *See id.*

Sarr finally urges constitutional avoidance, arguing that *Y-L-*'s creation of a presumption without an individualized consideration of dangerousness renders § 1231(b)(3)(B) unconstitutionally vague by providing inadequate notice of what crimes are covered. "To avoid that constitutional question," Sarr continues, we "should construe the statute not to permit the agency to create a presumption excusing it from ever considering noncitizens' dangerousness in a broad

swath of cases." But we rejected the basis for this position in *Miguel-Miguel*, reasoning that *Y-L-* actually "brings a measure of precision to § 1231(b)(3)(B)'s somewhat vague text." 500 F.3d at 950. Because *Miguel-Miguel* "remains precedential authority which binds us," *see Lopez*, 116 F.4th at 1045, Sarr's constitutional avoidance argument likewise fails.

## V

Sarr was convicted of a particularly serious crime and thus constituted a danger to the community, rendering him ineligible for withholding of removal. We deny the petition for review.

**PETITION DENIED.**